Number 161382, Peter P. Lawton, et al. v. Takeda Pharmaceutical Company, et al. Mr. Kovals? Yes. Good morning, Your Honor. If it pleases the Court, I represent Peter Lawton, the appellant. I'd like to reserve four minutes. You may have it. Thank you. The main issue in this case is relatively simple. It involves pleading standards under 9b in the context of a False Claims Act claim for off-label marketing and kickbacks. Under the False Claims Act, as I said, the drug at issue is Actos, which is a drug used to control diabetes. It's not approved for use or in the compendia for any other use. The allegations are that it was marketed to, and their kickbacks were paid in order to market the drug for pre-diabetes, which encompasses a broad swath of the population of the United States. The Court in Duxbury, this Court, has declined to provide a litigation manual. This is a quote from, in order to know what we plaintiffs need to see. There have been a few cases since then. There certainly have. But one thing about 9b is, well, one thing that it's intended to do is to eliminate false positives. It's supposed to eliminate the danger to a defendant's reputation. It's supposed to eliminate the cost of unnecessary discovery. Strike suits, it's supposed to eliminate that. And I would posit, Your Honors, that in this case, the way Judge Wolf rather perfunctorily analyzed all the allegations in the complaint, leaving aside the actual specific claims, which we'll get to, that leaves the danger of false negatives more than false positives. The allegations in the complaint benefit, in the second amendment of the complaint, benefit from discovery that came from a trial, documents and testimony from a trial, a product liability trial, that began in February 2014. And those documents show an overarching, nationwide, corporate-led scheme to off-label market Actos for prediabetes. The documents are very strong. They're cited in the complaint. I would direct the Court's attention to paragraph 94 of the second amendment of the complaint, which is on page 421 of the appendix. This is a document from a marketing meeting document from the year 2000, a corporate-wide document which shows a strategy to expand the market, to expand the class of persons who are going to receive and pre-prescribe this drug to people with prediabetes. And the complaint is replete with these kinds of allegations at the corporate level for a nationwide scheme. This document in 2000 forecasts a study that was done by a key opinion leader, Dr. Defonso, in 2006. It says that this study is going to happen. I'm sorry to push you ahead, but this isn't what the District Court was taking issue with. I don't know that the District Court spent a whole lot of time on this issue. Right, because it wasn't taking issue with it. I thought even if you assumed all of it to be true, the part where the District Court said you fell short under Duxbury in the follow-on cases, concerned even if there was a scheme, the scheme is not a scheme to make a false payment unless there is a request for reimbursement from some actor who was induced to do it by the scheme that you're describing here. So it's at that later stage where there's the problem and the complaint. So could you just address that part of what the District Court did? I absolutely will, Your Honor. If I may, Your Honor and Judge Stahl, you were on this Kelly v. Duvardis case, and I think that case actually is illustrative. If it's okay, I'll speak to that for a moment. In Kelly, at the District Court level, it was called Garcia down there, Judge Young had real problems with both relators, Kelly and Garcia. And this is 91F sub 3rd 87 at pages 108 and 109. And there he laid out what I see as a two-pronged analysis when it comes to 9B particularity for these types of cases. He said in the first instance, there was no specific claim for, and I'll read it. This is referencing Kelly. Kelly fails to provide even a single example of fraudulent conduct resulting in reimbursement of Xolair, that's the drug, by a federal health care program, and does not give sufficient information regarding the nationwide fraud and the importance of the false claims she alleges. He says that as to Kelly, he says that also as to Garcia. There's an and there. It's not just the specific claim, but it's that there's no nationwide fraud. And I think that's, and I just wanted to make this first point, which is, we'll get to the claim, but at that, we've got a nationwide fraud here. We benefit from documents that are not present in Kelly. We have corporate-level documents that deal with this. And those allegations, I do think, were given short shrift. Now, I'll turn to the claims, Your Honor. We have one, in terms of actual payments by a governmental entity, we have one paragraph, paragraph 190 of our second amended complaint. It's at the appendix 470. Eleven scripts that provide a lot of detail. And, again, I wish I had a litigation manual, but I don't. But what they do say is the exact amount that was paid for each of these 11 scripts. They say what the dosage was, that it was for Actos. They say that these were patients who did not have diabetes. We know the health care plan. We know, and I don't think it was a debate, or not a real debate, at the lower court level, and it hasn't come up here, that this health care plan is subject to the New York False Claims Act. We also noted, we noted at the lower court, I believe, we certainly did on appeal, that the Suffolk County health plan would not have paid for this if it wasn't medically necessary. So you're saying that because these other plans would have paid, Medicare or Medicaid must have paid? Your Honor, yes. We believe that this is indicia of not just payment by a Registered Accounting Plan. But you haven't said that they, in fact, did. You're just saying that, at least as I understand it, that because no one else would have paid, and people aren't going to do this for free, that the government programs probably paid. Are you saying any more than that? And I apologize if I'm not answering the question. We are saying that the federal government paid massive amounts for Actos. This question is on these 11 scripts that you just mentioned. What is the connection between the request for payment from the federal government and those 11 scripts? It's not a request from the federal government. We can see that there's no payment by the federal government. The government that paid for that claim was the Suffolk, was a regional government, a county government. So what's the evidence, aside from the general argument, aside from the general argument, do you have anything like the 11 scripts that relate to a payment by the federal government? No, Your Honor, we don't. And we conceded that on the first page of our reply. And if I may, the argument we are trying to make, and I think is a good one, and I would follow the Rost case on remand before Judge Saris, the Carpenter case, and the Duxbury case itself, which found a reasonable inference. It's also called an extrapolation theory. It was very close to Duxbury. I understood. I understood, Your Honor. And there was more there in Duxbury than you have. I dispute that, and I understand why certainly Judge Wolf brought that. We have the actual health plan paying these amounts. The one thing we don't have, and Judge Wolf, you said you mean the New York health plan? The Suffolk county, yes. So do you mean that part of your claim, which is the state false claim tax, survives even though the federal one doesn't? We certainly argue that, yes. But you have nothing approaching Duxbury with respect to the federal claims. We have no federal claims of any kind of particularity, much less so than Duxbury, yes, when it comes to federal claims. But you think the state law claims that you fled is equivalent to what Duxbury is not better? Yes. Could you just say how? Just walk me through that. Well, I listed all the facts that we have, and the two things that Judge Wolf thought we didn't have but he thought was necessary were the names of the doctors, perhaps the names of the pharmacies, and more precise dates. And his justification was that this would give notice to the defendants to be able to say, hey, no, that wasn't an off-label marketing. And I understand that point. But he was leaning towards it. He didn't get to it, but he was leaning towards a causation theory, I think. And under Carpenter, which we cite, and a number of other cases, Franklin, Park, Davis, causation can be pled without particularity. And I think we've pled it quite well if you look at the complaint as a whole. But this is something that is easily discovered, and I don't understand why the fact that we didn't name the doctors is a reason to prevent this case from going forward. At least that's what New York State is. It's easily answered in discovery. I don't understand. Why would the drugmaker have an incentive to keep that information? Oh, from Suffolk County itself? No, we're talking about the feds. Oh, why would they have any incentive to keep this information? Yes. To keep the information about whether there was off-label prescriptions? Did you obtain particular doctors prescribing off-label uses in order to get reimbursement from the federal government? The way we obtained it from Suffolk County, which I assume we could obtain from the federal government, is that we found out who wasn't a diabetic. That's how we did it. We could go doctor by doctor also to find out their prescribing habits. Dr. Mintz, for example, comes very close. Judge Wilt didn't like it, but Dr. Mintz in paragraph 141 comes very close. I'm sorry. Can I just ask you one more question? Sure. If there's no, I'm not saying this is how it will work, but if there's no federal, there's no sufficient evidence to show a federal claim, but if there were sufficient evidence to show a state claim, what's supposed to happen? Well, there could be, we could dismiss the part, portions that you think are not correct. That's the federal part. So this is, I presume these things are dependent to that federal part. And it could go down in carpenter and lost on remand. There was narrow discovery under a particular state, although it was federal. Or it could be dismissed without prejudice as to the neighborhood. It was dismissed with prejudice on both now? Yes. You're not suggesting that even if it were merely a state claim that survived, that the federal court could exercise jurisdiction over it? I'm not prepared today to say it couldn't, that it couldn't exercise some form of pendant. Under United Mine Workers, one doesn't usually exercise pendant jurisdiction when the federal claim does not survive. I guess in Kelly, that was what was, in Kelly, it was dismissed as to the federal claim and not the state's. Okay. But you need us to decide whether it should be dismissed with prejudice or without in either case. Absolutely, Your Honor. Mr. Franklin. Thank you, Your Honor. May it please the court, Jonathan Franklin for the appellees. I don't think the court needs to break any new ground in this case. In our view, the district court's judgment should be affirmed based on a straightforward application of this court's prior precedents in Roast, Duxbury, Gee, and most recently in Kelly. There's no question that the allegations of false claims act violations have to be pled with particularity, which means that it is not sufficient that they are merely plausible. The contours of the false claims act violation must be pled with particularity. And that means, as this court held in Kelly, that the complaint must contain, among other things, quote, particularized charges about specific fraudulent claims for payment. This complaint does not come close to meeting that standard. I think I understood opposing counsel to really almost admit that the federal claim does not have any allegations, and it doesn't, of any particularized claims regarding any false or fraudulent claims submitted to the federal government for payment. Instead, what they're trying to do is to say we have this generalized, he's saying nationwide, somewhat amorphous off-label marketing effort, and that we should then somehow infer or speculate that it would have or must have or did lead to the submission of unspecified false claims by unnamed doctors at unknown times. Well, they extrapolate from the fact that their sales went up significantly once this scheme, which they claim occurred, happened. Big boost in sales, and that this obviously, from their point of view statistically, had to have been paid by federal government. Yeah, they say that, but I don't think that's any different than what the courts already considered in Roast or Kelly, for that matter. In those cases, and I'll get to why I think this case is actually weaker than those, but in those cases, you also had allegations of these nationwide schemes to, in that case, directly market to doctors. You had in Roast allegations that up to 50% of the prescriptions were off-label. In Gee, you had, and I think this is important, the same evidence that they are relying on to show the purported existence of claims. It's a declaration showing how much money the government paid for Actos was deemed insufficient in Gee. This is not just sort of a comparison of things that are sort of like each other. This is the exact same declaration from the exact same case for the exact same proposition, and it was not sufficient in Gee, and I think it's not sufficient here for the same reason. In fact, why I think this case is even weaker is that in the other cases, that the courts considered in other cases that other courts have considered, you have these allegations that the defendants directly gave kickbacks to doctors who then allegedly wrote prescriptions and submitted false claims for approval of off-label uses or directly marketed the off-label uses to the doctors. Here, the scheme is much more amorphous. It's that Takeda paid these so-called thought leaders to write articles, scientific articles, touting the benefits of Actos, and that those somehow caused other doctors, who's never not named, to write false claims, and so you don't even have the element of how in the world that these were attributable. These false claims were attributable to our conduct, and I think it's really, at bottom, really just the same case or even worse case than you had in Roast or in Gee or in Kelly, all of which failed. You have, I think, ultimately what 9B is supposed to protect against. You have a complaint that makes harmful and ultimately not founded in the allegations of the complaint allegations of fraud, and what they want to do is engage in suspicion expedition to say, well, we hope to come up with something at a later time, and that's exactly what 9B is supposed to protect against. This is a heightened pleading standard. It's not one that is met simply by alleging plausibility. Could you walk through the 11 strips that they talked through? Why that's not enough? Because that's at least more specific, and they've got a program paying it. Right. Well, there's several reasons, and I think the district judge examined it correctly. First and foremost, there's no identification of any provider that submitted these scripts. We don't know who it was, and as the judge said below, you need to know who it was so that you can then say, well, were they, in fact, part of this fraudulent scheme or not? Second, Just so I understand, I don't totally grasp what the evidence, what the allegation is, what these scripts look like. I just not found it. It is one paragraph of their complaint, and all it says is that over a three-year period, not specifying particular dates, 11 prescriptions were written by unknown doctors for three unnamed plaintiffs who were not diabetic, and that those claims were paid by the Suffolk County Health Plan. That is, in essence, all that this one paragraph says. Why aren't the doctors named? Is it that their handwriting is illegible and you can't tell who it is? I don't know, Your Honor. That's one of the problems. We don't know. We're the defendant in this case. They are the relator. We don't know why they're not named, but we don't know who they are, and we're not told who they are in the complaint. So are you saying that this is no different than just not having alleged scripts at all? I'm saying that it does not satisfy Rule 9.1. I'm just trying to figure out what actually it is. They reference it. They have something in their mind that's a little more concrete than there might have been scripts. They seem to be talking about specific scripts. They said there were 11 prescriptions written over a three-year period for unnamed patients by unnamed doctors, and all that they say about these scripts is that the patients weren't diabetic. Do we know where it's coming from? All I know is what's in the complaint. With that information, could you go to the payer and say, okay, show me what you paid for? Would that be possible with that information? I don't know, Your Honor, but I think that is what they should. I think their contention is that it is. Well, I think that they're wrong on that. Why can't you find out from the payer? First of all, as a relator, the relator has the obligation to plead with particularity, and this is a heightened pleading standard. I thought the reason for it was so that the other party would be able to What we said before, as if I understood it, was that it allows the other party to then say, oh, well, if you're talking about those ones, those guys never attended the meetings where they had talked up active, so that can't be the case. And what I guess my question is, could you find from that complaint what you need to know so that you can answer it? Because they said, here are the scripts. Could you go to the New York payer and say, well, tell me about these scripts so that I can tell them, oh, it was those scripts. Those guys were out of town when they had the special marketing sections about Actos. Then you'd have all that you needed that our opinions have suggested is important for you to have. And I'm wondering why that's not so here. Because I think in the other cases, you could have asked those questions, too. You had specific hospitals that were alleged to be submitting claims in the other cases, and they were marketing, in the case of Kelly, to specific hospitals that were known to submit federal claims. But let me get to a direct point that makes this different. Isn't that different because they weren't identifying the specific scripts, or are you saying because they haven't told you the date of those scripts, when you go to the payer, there would be no way to know which ones they're talking about? Well, we have numbers. We have patient numbers. We do have patient numbers. Well, then that's different than Kelly. It's different, but I'll tell you why it's weaker, Your Honor, and I think this is an important point. It's not simply a question of did you go and talk to these doctors and encourage them to submit those claims. Their argument for a nationwide claim of fraudulent conduct here is that somehow these thought leaders that we paid somehow then influenced. So there was actually nothing particular. I understand the point. That's what I think what your fellow counsel was saying. That's getting towards causation, which might be that they didn't plead enough on causation, but that just is not how we decided the other cases. The other cases have all fallen apart because they didn't plead enough information about the script. But if I understand what you're saying, because they gave the patient numbers, that's not really true here with respect to the New York claim. And then for you to win on 9B, you have to go a step further and now say, well, how specific do you have to be about causation? Well, let me direct you to that point, Your Honor. I'd like to quote from footnote 9 in the Roast case. And what it says in footnote 9 is, quote, in other cases, relators have pled a connecting causal link, which strengthens the inference that false claims were submitted. No such allegations are made here. And what the court is saying in there is correct, and that is that if you plead a connecting causal link, that strengthens the allegation that false claims were committed. And we'll go through a connecting causal link in Roast. And I would submit that the link that they tried to plead in Roast was even more direct than here, where they were trying to actually argue that the doctors themselves were influenced directly. So whether or not, if you had pled a connecting causal link, that an allegation of a script that doesn't have a doctor's name, it doesn't have a date, and by the way, the date, those three-year period, most of that period occurred after our alleged off-label marketing effort ended. So if you... Some occurred within the zone. Well, we don't know, because they didn't say. They only said there were 11 prescriptions over this three-year period, beginning April of 2010, ending March of... But not the dates of each one. No dates. And... No dates, no patient name, no doctor name. I mean, none of that. But what's the patient... But you said there is a patient number? There is some sort of a number. I don't... I think it correlates with the patient. We don't... I mean, you just... Again, I'm just looking at the complaint. That's all I have. There's a number that's pled. I don't know exactly, because I'm not a member. I don't know that hospital, I don't know what that number means. But I think the point of the matter is that... But if it's a patient number, that's effectively giving you the patient name, isn't it? It's not giving me the patient, because I don't know what that number means. And I'm the defendant here, and I have to look at the complaint, because the particularity requirement of Rule 9b says the defendant needs to look at the complaint and have enough to respond to that. You should be able to look at that complaint, and you should be able to determine from that complaint who these people are. Did we do this? Is basically, yeah. Did we cause these false claims to be committed to make sure they get where they... Let me just... For what... As you plan the future, you know, patient number 645 for New York payer. They don't say it's John Smith, but presumably you can call New York payer, but who's patient 645? They'll say it's John Smith, so that seems a little technical. I suspect they wouldn't tell us, but... Could they tell you? I'm not an expert in that kind of law, but I'm guessing that there are problems with that. Yeah, but somehow your opponent gets the information. How they do it is their own business, but I think what they needed to do was more. And if they had all that information, it wouldn't have been difficult for them to plead the doctors. For some reason, they didn't. And that was saying that we didn't do it, but we should have to go and figure out who it was. And that's not how Rule 9B works. Maybe that's the way it works, and I don't even think, frankly, under Iqbal and Twombly, that would be the way it works now. But Rule 9B is even higher than that, and it has to... You have to plead with particularity. It's not a question of, can we get at the stuff? Tell me about this, by the way. Yeah. To me, it's interesting. I thought this case was going to be about statistical probability, but it's devolved into a discussion of 11 particular documents. Surely there must come some point where you can make enough of a statistical probability case that the government, in fact, got these claims. You've documented quite well that the claims may be fraudulent, and the government paid for it. I understand there are a lot of reasons to say this case doesn't reach that level. Judge Wolf suggested, in his opinion, that even if you got to that level, it wouldn't satisfy 9B because it would be so hard to defend against. Do you have any views on that? On what might satisfy? Is that your question? I'm just trying to make sure I understand the question before I answer it. Yeah. Assume a much stronger case than statistical probability. I can tell you, I just think that the statistical evidence in this case is no different than we had in Roast. High percentage of off-label use, large payments by the federal government, as in Guy. I was trying to think of this before I came in, and I was hypothesizing a case so that you had a situation where, not necessarily statistical evidence, but you had a company that... In every government contract, they always added 15% that was unjustified. And so you might have some information that they were paid under a government contract. You knew about this policy because you were an insider, which he's not. And there, you wouldn't necessarily have the specific false claims, but you would know because of this policy that was always followed that they did that. In this case, it's not even close, because here we're not even talking about us helping doctors coaching them to file claims as in some other cases, where it was actually direct involvement. Here, this is very indirect. I mean, just the thing that's a little strange, you might think about the rule that's developed in our case law, is that you have to show one claim to get them to war to prove 1,000 claims. Well, the one claim doesn't make it any really more likely or not that they have a 999 or good. What makes it likely that any claim is good is probably some general statistical analysis, which doesn't relate to any particular claim. And so it's just sort of a... Do you have a thought, since that's the rule you're defending, and I recognize where you're getting it from, what's the reason for that rule, in your view? What interest is it serving? I might take issue with the... First of all, I don't think they get in the door here, if I might answer the question. I know my time's up. I don't think they get in the door. I would actually take issue with what seems to be developed, that if you get in the door with a few claims that you can extrapolate. I don't think that should be the law. But I guess that's really my question. Since that's a premise of ours, is there any coherence to what we're saying? Because that is the rule, right? The rule you said is if you get in the door with a few claims, we can say that's enough for an inference that there must be thousands. And what you're saying is, which makes some sense, that doesn't make any sense. But if we take that as the premise, I guess a version of the next question would be Judge Lynch's, which is, well, if that's true, why do you need to get in the door with the one? Why couldn't you just use statistics to say there must be thousands? I would actually take issue... I don't think the court has expressly stated that if you get in the door with one, that's an inference that there were a lot others. I think that what the courts have said is that that just means the complaint passes 9B threshold. I would say that if I were devising a rule, and I don't think this case meets it, I would say, yeah, you pass the 9B threshold with those claims and no others. That's how I would say it. But, again, I don't think we even get there. I think that this is not a hard case. This is a case where the courts has precedence. The precedence just needs to be applied to this case. It's really not anything where the court needs to break new ground. Thank you. Thank you, Your Honors. You've reserved four minutes. Yeah. So I just think there's a little bit of a mistake about the allegations. There are very strong allegations of direct marketing to doctors here, and I can see, though, that those allegations don't tie directly to the scripts at issue. To answer a point that was made by you, Judge Lynch, I do think this is a statistics case, and there are some direct allegations we have about statistics. One comes from the relator himself. He worked at a very high level at GlaxoSmithKline, which was a competitor to Takeda, and they had a competing drug, Avandia, which was a direct competitor with Actos. And his intelligence group, this is between 2001 and 2003, at the start of this massive, what we call a massive, off-label marketing campaign, his intelligence group came and said that off-label marketing sales were skyrocketing. We're going from the number that we've alleged, that he's alleged, is from 5% to 30%. And if you couple that with the sheer size of Actos, the amount that's paid by the public fisc, $11 billion we've alleged over about nine years, and that it's paid under Part D, Medicare Part D and Medicaid, these numbers are astronomical. So then when you pull back and you look for checking the dots of this litigation manual and you find a few specific claims by a small county health plan, then we are at a statistical kind of certainty. That certainly is a point we make. I would just distinguish G. The only thing that's similar about this case in G is that it involves Actos. G, I believe in your honor, I believe you wrote it. We've all had our share of these cases. With apologies, we're back. But G is about adverse events and whether that gives rise to carte blanche false claims for every Actos prescription. And that's not where we are here. We're on just the off-label portion of that. And I think G is confined to that kind of a holding. I leave it to much smaller and better hands to actually opine on it beyond that. Rost, a lot of, in my mind, a lot of mischief has come from one particular paragraph in Rost. Rost is an interesting case because it involved human growth hormone, which the Department of Justice said the government didn't really pay for it. And based on that, no inference could be drawn. And that paragraph standing alone makes it look like there could never be any inference drawn. And I think that's too great a holding for Rost given the facts of that situation. I think it's in contradiction to a number of circuit courts, which cite to Duxbury quite favorably, which we've cited to in our footnotes. As to the limits to what we alleged on the specific claims for Suffolk County, those were, it's very hard as a private party to get claims and names of patients and names of doctors are not something that health plans are going to give away quite easily. And I guess I can leave it at that. What I do think needs correction is that the federal government has a lot of information under HIPAA. And HIPAA is the reason why these state plans or county plans in this case wouldn't give much information. But the federal government has a lot of information under HIPAA that can serve to use the statistical analysis for discovering how much off-label marketing, how much off-label prescribing there was. And our job at the statistical level is to just connect those to the marketing and the prescribing. And, of course, the federal government could have taken over the prosecution of this case. Yes, the federal government has taken the position that when it declines a case that is not. I understand. Yes. Are they still in that business in this district? I know at one point the U.S. Attorney's Office recovered more than $5 billion in health care fraud. I don't know actually whether the office is quite active now on that. They don't appear to be from my perspective. You might like them to be more active. They have other priorities perhaps. Okay. Thank you. Thank you. Thank you both.